# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## 2012-1670, -1685

NEXTEC APPLICATIONS, INC.,

Plaintiff-Appellant,

v.

BROOKWOOD COMPANIES, INC.,

Defendant-Cross Appellant.

---

Appeals from the United States District Court for the Southern District of New York in case no. 07-CV-6901, Judge Thomas P. Griesa.

---

## OPENING BRIEF OF DEFENDANT-CROSS APPELLANT BROOKWOOD COMPANIES INC.

Ethan Horwitz
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
ehorwitz@kslaw.com
Tel:  (212) 556-2100
Fax:  (212) 556-2222

Mary Katherine Bates
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA  30309
kbates@kslaw.com
Tel:  (404) 572-4752
Fax:  (404) 572-5100

Daryl L. Joseffer
Karen F. Grohman
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006
djoseffer@kslaw.com
kgrohman@kslaw.com
Tel:  (202) 737-0500
Fax:  (202) 626-3737

Adam M. Conrad
KING & SPALDING LLP
100 N Tryon Street, Suite 3900
Charlotte, NC  28202
aconrad@kslaw.com
Tel:  (704) 503-2600
Fax: (704) 503-2622

*Counsel for Defendant-Cross Appellant Brookwood Companies Incorporated*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Cross-Appellant Brookwood Companies Incorporated certifies the following:

1.    The full name of the party represented by me is Brookwood Companies Incorporated.

2.    The name of the real party in interest represented by me is Brookwood Companies Incorporated.

3.    Brookwood Companies Incorporated is a wholly owned subsidiary of The Hallwood Group, Inc., a publicly held corporation. No parent corporations or publicly held companies own 10 percent or more of the stock of The Hallwood Group, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are:

Alston & Bird LLP: Blas P. Arroyo; Jitendra Malik; Thomas J. Parker; Amy S. Manning; Natalie C. Clayton

King & Spalding LLP: Daryl L. Joseffer; Adam M. Conrad; Ethan Horwitz; Jonathan D. Ball (who is no longer with King & Spalding LLP); Hannah Yunkyung Lee (who is no longer with King & Spalding LLP); Kevin M. Dinan; Natasha H. Moffitt; Mary Katherine Bates; John A. Calabro

This 3rd day of May, 2013.       /s/ *Daryl L. Joseffer*
                                       Daryl L. Joseffer

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF RELATED CASES ..................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 1

INTRODUCTION ................................................................................... 2

STATEMENT OF ISSUES ..................................................................... 6

STATEMENT OF THE CASE ................................................................ 7

STATEMENT OF FACTS ....................................................................... 8

    A.  Brookwood And The Accused KK1 Machine ............................. 8

    B.  Nextec And The Asserted Patents ............................................. 10

    C.  The Government Contract ......................................................... 14

    D.  This Litigation .......................................................................... 16

        1.  Summary judgment on the '051 and '172 patents ............ 16

        2.  Trial on the '841 and '902 patents ................................... 17

        3.  The district court's decision at trial ................................. 22

STANDARDS OF REVIEW .................................................................. 23

SUMMARY OF ARGUMENT .............................................................. 25

ARGUMENT ........................................................................................ 28

I.    THE DISTRICT COURT REASONABLY FOUND THAT NEXTEC
    DID NOT PROVE SHEAR THINNING, AND THUS DID NOT
    PROVE INFRINGEMENT OF THE '902 AND '841 PATENTS ........ 28

    A.  The District Court Applied The Correct Legal Standard ........... 28

    B.  The District Court Reasonably Found That Nextec's Case Rested On
        Unproven Speculation That Brookwood Had Refuted. .............. 33

        1.  Brookwood relies on solvents and pressure, not shear thinning. ........ 33

            a.  Nextec demonstrated at most a theoretical possibility of
               shear thinning. .................................................................. 33

            b.  Brookwood refuted Nextec's speculation ................................ 35

            c.  Lawyer argument and untrained observations are no
               substitute for the actual trial record ..................................... 40

2.   Brookwood did not change its long-established, and admittedly non-infringnon-infringing, practice...................................................43

C.  Nextec's Remaining Arguments Are Meritless. .........................................49

II.  THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '172 PATENT BASED ON THE PLAIN AND ORDINARY MEANING OF "THIXOTROPIC."........................................................................................52

A.  The District Court Correctly Construed "Thixotropic."............................53

B.  Under Either Party's Proposed Construction, Brookwood Does Not Infringe. ......................................................................................................58

CROSS-APPEAL............................................................................................61

I.   THE ASSERTED CLAIMS OF THE '902 AND '841 PATENTS ARE NOT ENTITLED TO PRIORITY AND ARE INVALID AS A MATTER OF LAW. ......................................................................................61

A.  To Claim Priority, Each And Every Element Of The Asserted Claims Must Have Been Disclosed In The Earlier Applications. ..............61

B.  The '051 Patent Did Not Disclose All Of The Limitations Of The Asserted Claims. .........................................................................................64

1.   The '902 Patent ...............................................................................65

2.   The '841 Patent ...............................................................................69

C.  The Asserted Claims Are Invalid...............................................................71

CONCLUSION ...............................................................................................71

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Alza Corp. v. Mylan Labs., Inc.*,
    464 F.3d 1286 (Fed. Cir. 2006) .................................................................... 24, 50

*Anascape, Ltd. v. Nintendo of Am., Inc.*,
    601 F.3d 1333 (Fed. Cir. 2010) ............................................................ 62, 67, 68

*Anderson v. City of Bessemer City, N.C.*,
    470 U.S. 564 (1985) ................................................................................ 24, 31, 43

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) ...................................................................... 62

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
    365 U.S. 336 (1961) ........................................................................................ 63

*Baxter Healthcare Corp. v. Spectramed, Inc.*,
    49 F.3d 1575 (Fed. Cir. 1995) ........................................................................ 64

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns. Grp., Inc.*,
    262 F.3d 1258 (Fed. Cir. 2001) ...................................................................... 54

*Bicon, Inc. v. Strauman Co.*,
    441 F.3d 945 (Fed. Cir. 2006) ........................................................................ 57

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984) ........................................................................................ 64

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    296 F.3d 1106 (Fed. Cir. 2002) ...................................................................... 51

*Cephalon, Inc. v. Watson Pharms., Inc.*,
    707 F.3d 1330 (Fed. Cir. 2013) ...................................................................... 24

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
    677 F.3d 1361 (Fed. Cir. 2012) ...................................................................... 58

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009) ...................................................................... 56

*EnzoBiochem, Inc. v. Applera Corp.*,
    599 F.3d 1325 (Fed. Cir. 2010) ...................................................................... 24

*Frolow v. Wilson Sporting Goods Co.*,
    710 F.3d 1303 (Fed. Cir. 2013) ...................................................................... 30

*Go Med. Indus. Pty, Ltd. v. Inmed Corp.*,
  471 F.3d 1264 (Fed. Cir. 2006) .................................................................. 24, 64

*Hearing Components, Inc. v. Shure Inc.*,
  600 F.3d 1357 (Fed. Cir. 2010) ................................................................. 30

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008) ................................................................. 54

*Hollmer v. Harari*,
  681 F.3d 1351 (Fed. Cir. 2012) .................................................................. 24, 64

*In re Schneider*,
  481 F.2d 1350, 1356 (C.C.P.A. 1973) ...................................................... 62

*InterDigital Commc'ns, LLC v. ITC*,
  690 F.3d 1318 (Fed. Cir. 2012) ................................................................. 57

*Johns Hopkins Univ. v. Datascope Corp.*,
  543 F.3d 1342 (Fed. Cir. 2008 .................................................................. 30

*Jones v. Hardy*,
  727 F.2d 1524 (Fed. Cir. 1984 .................................................................. 64

*Kemco Sales, Inc. v. Control Papers Co.*,
  208 F.3d 1352 (Fed. Cir. 2000) ................................................................. 70

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
  500 F. App'x 951 (2013) ........................................................................... 24

*Lockwood v. Am. Airlines, Inc.*,
  107 F.3d 1565 (Fed. Cir. 1997) ................................................................. 67

*Lucent Techs., Inc. v. Gateway, Inc.*,
  543 F.3d 710 (Fed. Cir. 2008) ................................................................... 71

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .................................................................. 28, 30

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) .................................................................................. 58

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003) ................................................................. 51

*Nextec Applications, Inc. v. Brookwood Cos.*,
  703 F. Supp. 2d 390 (S.D.N.Y. 2010) ...................................................... 7

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ................................................................. 54

*Nutrition 21 v. United States,*
    930 F.2d 867 (Fed. Cir. 1991) ............................................................66

*RCA Corp. v. Applied Digital Data Sys., Inc.,*
    730 F.2d 1440 (Fed. Cir. 1984) ..........................................................70

*Renishaw PLC v. Marposs Societa' per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998) ..........................................................63

*Research Corp. Techs. v. Microsoft Corp.,*
    627 F.3d 859 (Fed. Cir. 2010) ..................................................... 62, 64

*Ruiz v. A.B. Chance Co.,*
    234 F.3d 654 (Fed. Cir. 2000) ............................................................64

*SEC v. DiBella,*
    587 F.3d 553 (2d Cir. 2009) ...............................................................31

*Tech. Licensing Corp. v. Videotek, Inc.,*
    545 F.3d 1316 (Fed. Cir. 2008) ............................................. 32, 63, 64

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
    247 F.3d 1316 (Fed. Cir. 2001) ..........................................................54

*Thorner v. Sony Computer Entm't Am. LLC,*
    669 F.3d 1362 (Fed. Cir. 2012) ..................................................... 23, 53

*Tronzo v. Biomet, Inc.,*
    156 F.3d 1154 (Fed. Cir. 1998) ........................................ 62, 66, 68, 71

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,*
    308 F.3d 1167 (Fed. Cir. 2002) ..........................................................32

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.,*
    602 F.3d 1325 (Fed. Cir. 2010) ..........................................................59

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007) ..........................................................57

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................56

*Wavetronix v. EIS Elec. Integrated Sys.,*
    573 F.3d 1343 (Fed. Cir. 2009) ..........................................................24

*Zenon Envtl., Inc. v. U.S. Filter Corp.,*
    506 F.3d 1370 (Fed. Cir. 2007) ..................................................... 62, 69, 71

**Statutes**

35 U.S.C. § 102 ................................................................................13

35 U.S.C. § 103 ................................................................................13

35 U.S.C. § 112 ..................................................................... 51, 62, 69

**Rules**

Fed. R. Civ. P. 52 ...........................................................................24

Fed. R. Civ. P. 56 ...........................................................................24

**Other Authorities**

'902 Reexam Certificate,
    Control No. 90/011,752 (Feb. 11, 2013) .............................................14

Final Office Action,
    Control No. 90/011,793 (Oct. 11, 2012) .............................................13

Final Office Action,
    Control No. 90/012,094 (Feb. 8, 2013) ..............................................13

Notice of Appeal,
    Control No. 90/011,793 (May 11, 2013)..............................................13

Response to Office Action,
    Control No. 90/012,094 (Apr. 8, 2013) ..............................................13

## STATEMENT OF RELATED CASES

There are no related cases in this or any other appellate court.

On April 5, 2013, Nextec Applications, Inc. ("Nextec") filed suit against the United States in the United States Court of Federal Claims, pursuant to 28 U.S.C. § 1498(a). In that suit, Nextec asserts that the United States is liable for patent infringement based on the same conduct of Brookwood Companies Incorporated ("Brookwood") that Nextec accuses of infringement in this case. *Nextec Applications, Inc. v. United States*, No. 1:13-cv-00242-NBF, Dkt. 1 (Fed. Cl. Apr. 5, 2013).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. The court entered final judgment in favor of Brookwood on June 21, 2012, A2, and denied Nextec's motion to amend the judgment on August 14, 2012, A1. This Court has jurisdiction under 28 U.S.C. § 1295.

1

## **INTRODUCTION**

To make specialty fabrics with certain characteristics, such as breathability and water-resistance, Brookwood and Nextec coat fabrics with polymers. Brookwood has long used "chemistry" to coat fabrics. Specifically, Brookwood uses solvents to thin a coating material so that the material may flow into fabric under pressure exerted by a coating knife. In contrast, Nextec's patents cover a mechanical approach called "shear thinning." Under that approach, mechanical application of a lateral force (shear) reduces the viscosity of the coating on a fabric, causing the coating to enter the fabric.

Following a five-week bench trial, the district court found that Nextec had not proven, by either direct or circumstantial evidence, that Brookwood infringed U.S. Patent Nos. 5,954,902 ("'902 patent") or 6,289,841 ("'841 patent"). As for direct evidence, the court concluded that Nextec and its expert had presented only "theory" demonstrating no more than "the possibility of shear thinning" by Brookwood. A3445; A4176-77. The court further explained that, although "nobody really knows what goes on under th[e coating] knife" of Brookwood's machine, Brookwood's experts and other evidence "counter[ed] the expert theory put forward by" Nextec. A4176-77.

When it became clear to the district court that Nextec could not carry its burden of proof with direct evidence of what happens under the knife, the court

encouraged Nextec to try to prove its case another way.  In light of the undisputed evidence that Brookwood had coated fabrics in a non-infringing manner for decades before the time period relevant to this dispute, the court asked Nextec's expert what steps a company like Brookwood would take to change from a non-infringing use of solvents to the patented shear thinning.  The court then directed Brookwood to present witnesses who could testify about whether Brookwood had taken those steps.  After hearing from numerous witnesses, the court found "there is no evidence of any conversion from the use of solvents to shear thinning.  The evidence is completely to the contrary."  A4177.  The court concluded that Nextec had failed to carry its burden of proving shear thinning, and thus infringement.

Nextec's appeal runs headlong into the record and the deferential standard of review.  Nextec argues, for example, that several Brookwood witnesses were "not credible."  Blue Br. 34.  That was for the district court to determine at trial.  Nextec posits that the court "took a confused and tortuous path," demonstrated "severe disinterest in reviewing the factual and legal underpinnings of its rulings," and engaged in "wholesale adoption of irrelevant tests and analyses."  *Id*. at 5, 7, 29.  That specious attack on the district court changes neither the record nor the standard of review.

If anything is "confused," it is Nextec's attempt to paint the district court as having erred as a matter of law by entertaining a "practicing the prior art" defense

to infringement.  As noted above, the court actually found that Nextec did not prove shear thinning with *either* direct evidence *or* the alternative, circumstantial route suggested by the testimony of Nextec's expert.  Nextec fails to mention the key premise underlying the court's consideration of Brookwood's past and current practices—it was undisputed that Brookwood's past practice did not infringe because it did not shear thin.  According to Nextec's expert, that meant that, without specific changes required to implement shear thinning, Brookwood's current practices could not infringe, either.

Nextec also challenges the district court's construction of a different claim term, "thixotropic," in a third patent, U.S. Patent No. 5,869,172 ("'172 patent"). There is no dispute, however, that the court adopted the plain and ordinary meaning of that term, and that the patent applicant used that term according to its plain and ordinary meaning in related patent applications.  As the district court concluded, nothing in the specification clearly overcomes those crucial points. Moreover, even under Nextec's definition of "thixotropic," the '172 patent requires that shear force cause a liquid to flow into fabric, which is exactly what the district court found to be absent from Brookwood's process.  Following the bench trial, therefore, the parties' dispute over that term's precise meaning no longer matters.

While Nextec's appeal rests primarily on mischaracterizations of the district court's rulings and the record, the court did make one important error of law.  It

held that the asserted claims of the '902 and '841 patents can claim priority to the filing date of earlier applications in this oft-continued family of patents because "the whole chain relates to the same basic invention." A4178. The correct legal standard is more specific: it asks whether all of the limitations of an asserted claim were disclosed in the earlier application, not merely whether the applications concern the same basic invention. Under that standard, the asserted claims are not entitled to priority. Without priority, they are also invalid because they were anticipated by prior art.

## STATEMENT OF ISSUES

1.      Whether the district court clearly erred in finding that Nextec had not proven that Brookwood practices the "shear thinning" limitations of the asserted patent claims.

2.      Whether the district court erred in giving the claim term "thixotropic" its undisputed plain and ordinary meaning and, if so, whether a different claim construction would affect the outcome of this case.

3.      Whether the asserted patents are entitled to the filing date of an earlier, related patent application.

## <u>STATEMENT OF THE CASE</u>

Nextec brought this suit on July 31, 2007, alleging that Brookwood and its parent corporation, The Hallwood Group, Inc., infringe five patents: U.S. Patent Nos. 5,418,051 ("'051 patent"); 5,856,245 ("'245 patent"); 5,869,172 ("'172 patent"); 6,071,602 ("'602 patent"); and 6,129,978 ("'978 patent"). A233-82. The district court dismissed the Hallwood Group, Inc. in October 2007. A400-01. Nextec later amended its complaint to assert two more patents, U.S. Patent Nos. 5,954,902 ("'902 patent") and 6,289,841 ("'841 patent"). A283-92.

On January 6, 2009, the district court dismissed some of Nextec's claims because Nextec could pursue them, if at all, only against the United States in the Court of Federal Claims. A402-03. Nextec then dropped all of its claims under the '245, '602, and '978 patents. A404-05; A293-94.

On March 31, 2010, the district court construed two disputed claim terms and granted summary judgment of non-infringement with respect to the '051 and '172 patents. A19-40; A42, *reported at Nextec Applications, Inc. v. Brookwood Cos.*, 703 F. Supp. 2d 390 (S.D.N.Y. 2010) (Holwell, J.). On April 30, 2012, the court commenced a bench trial on the remaining claims of the '841 and '902 patents. A3000.

On June 1, 2012, the district court found that Nextec's patents were not infringed and not invalid. A4173-78. Nextec filed a motion to amend the court's

finding of non-infringement or in the alternative for a new trial, A344-77, which the court denied on August 14, 2012, A1.

**STATEMENT OF FACTS**

**A.    Brookwood And The Accused KK1 Machine**

Brookwood and its predecessors (collectively, "Brookwood") have processed fabric for decades at the Kenyon Industries facility in Kenyon, Rhode Island.  A3157.  Brookwood began using the accused machine, known as "KK1" or the "KK1 coater," in 1964.  A3161; *see also* A9.



**A5201**

As depicted above, fabric starts out in a roll on one end of the KK1 (the left-hand side of this figure).  *See* A3152-54; A5201; A5748.  KK1 runs that fabric through and over a series of rollers, passing the fabric over a table before lifting it into position under a sharp knife (also referred to as a blade).  A3153-57; A5201; A5748.  The KK1 is called a floating-knife or knife-over-air coater because the table ends just before the knife, which effectively floats in air.  *See* A3153; A3251; A3529-30; A5203 (depictions A and B).  Before the fabric passes under the knife, a coating composition is deposited onto the top of the fabric.  A3154-55; A5201;

8

A5748. The knife spreads and pressures that composition on and into the fabric as it passes under the blade. A3155-57; A3196; A3200-01, A3205-06; A3257-59; A3310; A3371-74. Floating-knife coaters are among the most common coating machines in the fabric-coating industry. A3251.

Brookwood's coating composition is made up of a polymer and a solvent that reduces its viscosity (*i.e.*, thickness). A3196; A3285-86; A3310; A5090; A5730-47. The "chemistry" of this polymer-solvent combination affects the coating's consistency and allows it to flow onto the fabric under the pressure of the coating knife. *See, e.g.*, A3191; A3196; A3209-10; A3310; A3371-74. The solvent later evaporates, leaving the polymer behind. A3152; A3198; A3311-12; A5828.

In the early 1980s, Kenyon employee Benito Boiardi developed a method of using KK1 to make fabric water resistant while maintaining good "hand" (*i.e.*, good feel to the hand). A3539; A3572-73. Internally, Brookwood called this the "Ken Reign" formula. A3539. Ken Reign used a polymer-plus-solvent coating with a sharp knife, depressed into the fabric, run at line speeds of 9-11 yards per minute, scraping on a very thin layer of coating. *See, e.g.*, A3151-53; A3521-25; A3538-39; A3565-70; A5090; A5838; A5839-40; A5841; A5842; A5843; A5844; A5845. Over the years, Brookwood has used and marketed that general method for the production of many different fabrics. A3526; A3539; A3569; A3358;

9

A6043. For any given product, Brookwood adjusts the formula to meet the customer's specifications or to impart different qualities to different fabrics (such as the required strength, weight, or density), which affect performance. *E.g.*, A3311-12; A3523-33; A3568-69.

### B.    Nextec And The Asserted Patents

Also in the 1980s, inventor J. Michael Caldwell developed a different approach for treating fabric so that it maintained good hand. *See* A5401-03. This approach used mechanical means to thin the polymer. Instead of applying thinned polymer as a surface coating, Caldwell used shear thinning to force a polymer into the fabric, "encapsulating" the fibers in the middle of the fabric and leaving the surfaces free of the material. A5399-5403; A5439-44.

In general, shear is a "lateral force," such as that exerted by a hand rubbing across a desk, A3085; shear thinning is a means of reducing the viscosity (or thickness) of a material in response to shear, A39-40; A3085; A3191-94; and a "shear thinnable" material is a material whose viscosity is reduced in that manner, *see, e.g.*, A3027, A3086, A3192. In contrast, "Newtonian" materials like water are not capable of having their viscosities lowered by shear. A3191; A3193; A3371.

Caldwell and Nextec touted Caldwell's system as being unique, in part because it took solids with a viscosity similar to bathroom caulk and shear-thinned them to have the consistency of water. *See* A191 Col. 36:28-37; A5384 Col.

40:36-40; A5834.  To treat fabric with this mechanical method, Nextec developed "proprietary production equipment … unique in the textile industry."  A5834.

"The sophistication of [Nextec's] process require[d] computer controlled equipment that combine[d] technology and expertise from the aerospace, printing and textile industries."  *Id.*  Because that highly technical and detailed process was difficult to control, Nextec incurred production problems that prevented it from delivering fabric on time or according to customers' specifications, resulting in repeated customer complaints.  *See* A3312; A5394; A5395; A5709-13; A5714-15; A5716-29; *see also* A5400.

In general, the asserted patent claims are directed to systems or methods for coating fabric with a shear thinnable polymer composition to encapsulate the fabric fibers, leaving the surface of the fabric substantially free of polymer, and ultimately controlling the porosity of the coated fabric.  A80; A127; A151.  In pertinent part, the asserted claims of the '841 and '902 patents read as follows:

> **Claim 1 of the '841 patent:**  System for controlling the placement of a shear thinnable polymer composition into a porous web ..., comprising:
> ...
> means for shear thinning the polymer composition to substantially reduce its viscosity and selectively place it into the tensioned web to encapsulate at least some of the structural elements of the porous web by enveloping exposed surface portions of the structural elements.

A206.

> **Claim 57 of the '841 patent:**  System for controlled placement of a shear-thinnable polymer composition into a porous web ..., comprising:

...
means for shear thinning the polymer composition to reduce its viscosity and place it to encapsulate at least some of the structural elements of the porous web by enveloping exposed surface portions of the structural elements ....

A207-08.

> **Claim 1 of the '902 patent:** A method of controlling the effective pore size of a web, wherein said web has a three dimensional structure comprising structural elements with interstitial spaces therebetween and a top surface opposed from a bottom surface, comprising the steps of:
> ...
> subjecting said shear thinnable material to sufficient shear thinning energy to cause the shear thinnable material to flow into the web, selectively position within the web and form a thin film substantially encapsulating at least some of the structural elements of said web, wherein most of the interstitial spaces between structural elements of said web remain open.

A149. As relevant here, the "web" is the fabric, and the "structural elements" of the web are the fibers in the fabric. A4174.

The claims of the '172 patent further narrow the claimed methods to "shear thinnable, thixotropic" materials. *See, e.g.*, A122. According to their technical definitions, shear thinning involves application of an *increasing* rate of shear to reduce a material's viscosity, whereas thixotropy involves application of a *constant* rate of shear. *See* A27. Exemplary claim 110 of the '172 patent recites a "method of controllably applying a combination of treating materials to a porous web" by, among other things, "applying a curable shear thinnable, thixotropic material to said porous web" and "subjecting said thixotropic material ... to sufficient energy to cause the thixotropic material ... to flow into the porous web." A125.

12

During prosecution of a related parent patent application that issued as U.S. Patent No. 5,876,792, Caldwell differentiated prior-art approaches from his own by representing that his "invention does not rely upon viscosity reducing agents." A447; *see also* A5834. Caldwell differentiated between control due to shear thinning in his claimed invention, and what he described as the uncontrolled placement of polymer in a traditional solvent-based coating process. A425-26; A447. Although prior art had used both solvents and shear thinning, Caldwell stated that this prior art had used solvent levels that precluded any effort to control the flow of the coating. A225-26.

The Patent and Trademark Office (PTO) has reexamined the '841, '902, and '172 patents. On October 11, 2012, the PTO issued a final rejection of claims 1 and 57 of the '841 patent under 35 U.S.C. § 103(a), finding both claims invalid as obvious. Final Office Action, Control No. 90/011,793 (Oct. 11, 2012). Nextec has appealed to the PTO's Patent Trial and Appeal Board. Notice of Appeal, Control No. 90/011,793 (May 11, 2013). On February 8, 2013, the PTO issued a final rejection of claim 110 of the '172 patent under 35 U.S.C. § 102. *See* Final Office Action, Control No. 90/012,094 (Feb. 8, 2013). Nextec responded to the office action on April, 8, 2013. Response to Office Action, Control No. 90/012,094 (Apr. 8, 2013). The PTO issued an *ex parte* reexamination certificate for the '902 patent on February 11, 2013, without amendment. '902 Reexam Certificate, Control No.

13

90/011,752 (Feb. 11, 2013).

### C.    The Government Contract

In 2005, the U.S. government issued specifications for what it termed the Generation III (or GEN III) Extended Cold Weather Clothing System for U.S. military uniforms, which encompassed seven different clothing layers. *See* A9. The first three layers are essentially underwear, and the outer four are jacket and trouser products. A5708; A4036-37. Levels 5 and 7 are at issue in this case. The specifications for those levels address dynamic absorption, breathability, stiffness, colorfastness, pore size, and other performance characteristics. *See* A5595-98; A5657-63. The military based those specifications on the performance of fabric Nextec had produced for U.S. Special Forces. A3023; A3317-18; A4038-39; A5558; A5929.

Atlantic Diving Supply ("ADS") was the prime government contractor responsible for hiring and managing subcontractors and delivering the uniforms. A3510-11; A4040-41; A5752-27. ADS initially contracted with Nextec to provide the Level 5 and 7 garment fabric. A4040. Nextec failed to produce the necessary fabric at the rate and quantity needed. A3514; A4056; A4176. The government often rejected the fabric Nextec did produce or accepted it under a special waiver necessitated by a surge in troop deployment. A3514; A4042. The government

14

also imposed steep financial penalties due to Nextec's failure to meet significant product performance specifications for Level 7 fabric.  A3517-18.

In January 2007, the government and ADS looked to Brookwood for fabric meeting the GEN III specifications.  A3514; A4038-39; A5558.  Brookwood had been a long-time supplier of the military, and of high-performance fabrics generally, and had commenced testing for GEN III fabric when the government issued the initial specifications in late 2005.  A3312; A3522-23; A4035-37; A4045; A4058-59; *see also* A9.

In March 2007, Brookwood became a qualified supplier.  A4041.  Once Brookwood resolved typical supply-chain issues, the garment makers "moved forward successfully with Brookwood in the program."  A3518-19.  Brookwood produced the fabrics with its traditional KK1 coating method, adjusted to meet the government's specifications.  A3615.  Brookwood initially coated the Level 5 and 7 fabrics, also known as Agility Storm-Tec Xtreme and Eclipse Storm-Tec X-Treme, respectively, with a polymer composition named M-1074B.  A3151; A3158-59.  Brookwood later coated Level 5 fabric with a different polymer composition called 52668.  A3152; A3159.  The 52668 and M-1074B coating materials were silicone compositions containing about 30 percent solid material and 70 percent solvents.  *See* A3285-86; A3375-76; A3563-64; A5091; A5744.

## D.    This Litigation

Nextec filed this lawsuit in July 2007.  *See* A10.  Nextec accused (i) Brookwood's process for making Level 5 and 7 fabrics, and (ii) the fabrics themselves.  A233.  The district court dismissed product claims pursuant to 28 U.S.C. § 1498(a), which requires that certain infringement claims be brought against the United States in the Court of Federal Claims.  *See* A402-03.

### 1.    Summary judgment on the '051 and '172 patents

After Nextec dropped three of the seven asserted patents from this suit, *see* A293-94; A404-05, the district court granted Brookwood's motion for summary judgment of non-infringement with respect to all asserted claims of the '051 and '172 patents.  *See* A42.  Each of those claims includes the term "thixotropic," *see* A10; A42; A122-25, which the district court construed according to its ordinary meaning:  "having liquid flow behavior in which the viscosity of a liquid decreases over time in response to the application of a constant or steady shear force," A28.  The court rejected Nextec's argument that the '172 patent specially redefines the term, noting that the '172 patent incorporates by reference related patents and applications (including the '051 patent) that clearly use the term in its ordinary sense.  *See* A28-31.  The court then granted summary judgment of non-infringement because Nextec had "placed all its eggs in the claim construction

basket" and introduced no evidence that Brookwood's polymer compositions were thixotropic as construed by the court.  A42 & n.17.

### 2.    Trial on the '841 and '902 patents

The district court later held a bench trial on infringement and validity of claims 1 and 57 of the '841 patent and claim 1 of the '902 patent.  The trial lasted 19 days over the course of five weeks.  *See* A228-29.  Nextec's infringement and validity expert, Dr. Christine Cole, and one of Brookwood's experts, Thomas Colasanto, each came to the stand on at least five different occasions.  *See, e.g.*, A3072; A3128; A3250; A3414; A3624; A3689; A3757; A3840; A3854; A4138.

The district court focused the infringement segment of the trial on a single claim limitation common to all asserted claims—the shear thinning limitation, which requires shear thinning of a material so as to cause it to flow into the web and encapsulate the fibers.  *See, e.g.*, A3012; A3422.  Everyone agreed that, if Brookwood did not shear thin its polymer composition so as to cause it to flow into the fabric web as it passed beneath the blade of KK1, Brookwood did not infringe any of the asserted claims.  *See* A3010; A3012; A3307; A3445.

***Direct evidence concerning shear thinning.***  Nextec's expert, Dr. Cole, presented various infringement theories over the course of several days, including the one Nextec relies on in this Court:  that the compositions' viscosities, and scanning electron micrographs ("SEMs") of Brookwood's treated fabrics, "prove

conclusively" that Brookwood used shear thinning to cause the polymer to enter the fabric. *E.g.*, Blue Br. 19. SEMs are highly magnified pictures of tiny portions of the relevant fabrics. *See* A3141, A3368.

Dr. Peter Hauser countered Dr. Cole's theory by conducting a "pressure test" that used pressure alone to force M-1074B and 52668 into fabric. A3208-13; A3373-74. Dr. Hauser also ran materials that cannot be shear thinned, and that have viscosities at least as great as those of M-1074B and 52668, through KK1 with and without solvents. A3208-14; A3371-73; A3409. He testified that his experiment showed, contrary to Dr. Cole's theory, that it is possible to cause the polymers to enter fabric under the pressure of the KK1 blade alone. *See* A3410.

A second expert, Dr. David Pine, likewise testified that, for polymers with the viscosities of M-1074B and 52668, "what clearly makes the liquid go in [the web] is the pressure exerted by [KK1's] knife"—not shear thinning. A3200. Dr. Pine elaborated that even if there is "a little bit" of shear thinning under the KK1 blade, it is insufficient "to make any difference for how the liquid goes into the fabric." A3203. He demonstrated that, in light of the KK1 blade's width, the polymers are under the blade for too short a time for shear to cause them to enter the web. A3196; A3199; A3202-03. Another Brookwood expert, Mr. Colasanto, agreed that "there may be a small amount of shear thinning," but not enough to "caus[e] the coating to flow in the KK1 coater; it's the presence of solvents and the

18

pressuring under the knife …" that cause the coating to flow into the fabric. A3310; *see also* A3307.

Brookwood's experts also explained that each of the SEMs on which Nextec relied was only a snapshot of the coating level at one tiny pinpoint on the fabric. *See* A3208; A3368; A3410. A single yard of fabric could allow for tens of thousands of individual SEMs; no single SEM could depict conditions across the entire fabric. *See* A3368-69; A3410. Indeed, the penetration and position of the coating varied significantly in the SEMs presented by Nextec. *See* A3143-44; A3368. Thus, "[y]ou could look at various SEMs [from a given fabric] to choose what you wanted to see." A3368. The experts further testified that, while SEMs may show the penetration of polymer into a fabric, they do not reveal what caused it to enter the fabric. *See* A3200; A3369; *see also* A3098.

*Indirect evidence concerning shear thinning.* On the eighth day of trial, the district court determined that the evidence to that point had identified only theories about whether Brookwood's process involves the claimed shear thinning, "[b]ut theories don't necessarily tell what actually happened." A3445. The court noted that the parties' experts were "honest and helpful, but they cannot really testify in any physical sense, in any sense of observations, in any sense of actual measurements, as to exactly what happened under that blade." A3445.

The district court then acknowledged that Nextec's expert, Dr. Cole, had identified secondary indicia of infringement whereby Nextec could try to prove through circumstantial evidence that Brookwood was coating by shear thinning. A3445.  Dr. Cole had acknowledged that Brookwood's historic use of the KK1 coater using polymers combined with solvents (*e.g.*, its Ken Reign system) did not practice the patented invention.  *See* A3431-32; *see also* A3700.  She opined that shifting from this chemical, solvent-based process to one that employed shear thinning would require a deliberate effort marked by research and development and certain, specific changes to the coating process.  *See* A3431-33; A3445.

According to Dr. Cole, there would be a number of indications that a company had made such a change.  First, "[y]ou would have to go purchase a shear thinnable polymer composition.  The second [thing you would address] is the geometry of the machine."  A3432.  "If I really wanted to go make a coated fabric using shear thinning, to place the polymer composition, I would make the distance between the top of the fabric and the bottom of the blade as close together as possible."  *Id.*  Third, "[y]ou either run your line speed faster or you decrease the coating of your layer."  *Id.*  She defined line speed as "the rate at which the fabric goes through the machine."  *Id.*

Dr. Cole differentiated between the changes that would accompany a switch to shear thinning and the normal adjustments a company would make to produce a

new product with an existing coating method, such as Brookwood's historic solvent-based process. A3432; A3446. As the district court explained, "Dr. Cole also made it clear that whether it's a matter of using solvents or a matter of using shear thinning, there may need to be adjustments to blade height, possibly other things, to comport with the type of process that is being done." A3445; *see also* A3432-33. These adjustments produce fabrics with different qualities, including different coating thicknesses and uniform application of coating. *See* A3432-33; A3358.

The district court credited Dr. Cole's analysis, stating that "I think Dr. Cole was very frank and honest ...." A3445. The court then determined that "right now I do not believe that the plaintiff has introduced any evidence that there was a change made at Brookwood from one process to another for these fabrics in question. And the plaintiff has the burden of proof." A3445. The court directed Brookwood to produce witnesses to testify on these issues, so as to enable Nextec to pursue the type of evidence that Dr. Cole had described. *See* A3445-46. Seven Brookwood employees testified about Brookwood's manufacturing process. In discovery, Brookwood had also produced the entire record of its research and development of the Level 5 and 7 fabrics.

The President of Brookwood's finishing plant, Joanne Bagley, testified that the same sharp knife used on KK1 from the time of its creation in the 1960s is still

used today.  A3151, A3153.  Steven Nelson, who has worked for Kenyon Industries since 1978, testified that Brookwood has used sharp blades like those used for Levels 5 and 7 "since at least 1979."  A3525; *see also* A5839-40. Mr. Boiardi, a coating chemist at Kenyon Industries since 1971, corroborated this testimony, A3539; A3583-84, and described having "depressed the blade as far as [it] could go"—"as much as we could and still run the product"—at least as early as 1993, A3565; *see also* A3157; A5838.

Mr. Boiardi further testified that Brookwood had been using similar polymer compositions, including silicon polymers, since the 1980s.  A3536; A3538-39; A3566-70; A3584.  Three other employees agreed with that testimony, A3156-57; A3523; A3619, which was corroborated by lab notes and fabric samples, *e.g.*, A5090; A5841; A5842; A5843; A5844; A5845.

Ms. Bagley testified that Level 5 fabric is "run [on] the coater at a speed of 9 to 10½ yards per minute," speeds unchanged since the 1970s.  A3152.  Two other witnesses and documentary evidence confirmed that testimony.  *E.g.*, A3526; A3529; A3532; A3534; A3537-38; A5839-40.

### 3.    The district court's decision at trial

After 19 days of trial, the district court found that "Brookwood did not use shear thinning."  A4175.  The court explained that "one cannot get under that knife and see in any way with a microscope or otherwise exactly what is going on."

A4176.  After emphasizing that "Nextec's case depends on theories" rather than proven facts, the court credited the testimony of Dr. Pine and Dr. Hauser, which "counter[ed] the expert theory put forward by" Nextec.  A4176-78.

The district court further determined that Brookwood's witnesses were credible and testified accurately, and that "there is no evidence of any conversion from the use of solvents to shear thinning.  The evidence is completely to the contrary."  A4177.  For that reason, "the issue of infringement is solved rather directly and rather simply."  *Id.*

Finally, the district court rejected Brookwood's argument that the '902 and '841 patents could not claim priority to earlier, related patents and were therefore invalid in light of the prior art.  The court concluded that every patent in the chain of continuation and continuation-in-part applications "relates to the same basic invention."  A4178.

Nextec reargued the evidence in a post-trial motion to amend the court's finding of non-infringement or for a new trial.  A344-77.  The district court denied that motion.  A1.

## STANDARDS OF REVIEW

This Court reviews a district court's claim construction and grant of summary judgment *de novo*.  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *EnzoBiochem, Inc. v. Applera Corp.*, 599 F.3d

1325, 1331 (Fed. Cir. 2010).    Claim construction is a question of law, and infringement is a question of fact.    *Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1355, 1358 (Fed. Cir. 2009).    Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56.[1]

Following a bench trial, this Court reviews a district court's factual findings for clear error.    Fed. R. Civ. P. 52(a)(6); *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006); *see also Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013).    A fact finding is clearly erroneous only if this Court is left with a definite and firm conviction that the district court erred.    *Alza Corp.*, 464 F.3d at 1289.    Credibility determinations are committed to the district judge's sound discretion because he observed the witnesses at trial.    *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985).

"Whether the intervening patents in a chain of priority maintain the requisite continuity of disclosure is a question of law [this Court] review[s] *de novo*."    *Hollmer v. Harari*, 681 F.3d 1351, 1355 (Fed. Cir. 2012); *accord Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1270 (Fed. Cir. 2006).

---

[1] This Court is considering *en banc* whether to alter the standard of review for claim construction.    *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 500 F. App'x 951 (2013).    The decision in that case may affect the standard of review in this one.

## SUMMARY OF ARGUMENT

I.      The district court correctly found, as a fact, that Brookwood did not infringe the '902 and '841 patents because it did not use shear to thin coating materials.   During the 19-day bench trial, Brookwood presented laboratory documents, coating methodology records, expert testimony, and employee testimony, all of which demonstrated that Brookwood did not practice the claimed shear thinning.   By contrast, Nextec's expert relied on a speculative theory that Brookwood "must" have shear thinned to produce the results shown in certain images.

As the district court found, that theory did not fit the facts.   It showed at most the "possibility" of shear thinning.  A4176.   On appeal, Nextec confirms the theoretical nature of its case by relying heavily on lawyer argument based on Newton's Second Law, purported "testimony ... from Sir Isaac Newton," Blue Br. 19, and other "facts" and exhibits that are nowhere to be found in the trial record. The district court was certainly not *required* to accept Nextec's speculation, especially considering that Nextec bore the burden of proof and that Brookwood's evidence had "counter[ed]" Nextec's "theory."  A4177.

In addition, Brookwood proved the absence of shear thinning a second time over by showing that it never altered its historic, solvents-based process in order to switch to shear thinning.  Nextec's own expert testified that Brookwood's historic

process did not infringe, and that Brookwood would have had to take several specific steps to convert to an infringing use of shear thinning.  Witness testimony and supporting documentation showed that Brookwood had not taken the steps necessary to infringe, and Nextec did not prove otherwise.

Nextec responds that the district court erred as a matter of law by recognizing an improper "practicing the prior art" defense to infringement.  The court did no such thing.  Far from entertaining any such affirmative defense, the court found that Nextec did not carry its burden of proving shear thinning, and thus infringement, in the first place.  The undisputed facts that Brookwood's historic practice did not infringe, and that Brookwood would have had to take significant steps to infringe, simply provided a second way for Nextec to try to prove infringement.  But even after taking that second bite at the apple, Nextec failed to sustain its burden of proof.

II.    Nor did the district court err in construing the claim term "thixotropic" in the '172 patent to mean "having liquid flow behavior in which the viscosity of a liquid decreases over time in response to the application of a constant or steady shear force."  A31.  There is no dispute that this is the plain and ordinary meaning of the term, and that other patents and applications in the same family use the term according to that meaning.  As the court explained, Nextec's contrary construction overreads a single, descriptive passage in the '172 specification that

refers generally to the *results* of the claimed invention, not to the precise *definition* of that one claim term.

In any event, that claim construction no longer matters. Even under Nextec's definition of "thixotropic," the '172 patent requires that shear force cause liquid to flow into fabric. Thus, even apart from the disputed aspects of that claim term's meaning, Brookwood did not infringe the '172 patent for the same reason it did not infringe the '902 and '841 patents: it used solvents, not the claimed shear thinning.

III. Although the district court's judgment of non-infringement rests on well-supported findings of fact, the court applied the wrong legal standard in holding that the asserted claims of the '902 and '841 patents are not invalid. The court determined that those patents claim priority to the filing date of an earlier application because all of the relevant patents "relate[] to the same basic invention." A4178. The question is not whether all of these patents relate to the same basic invention, however; it is whether each limitation of each asserted claim was disclosed in the earlier applications. Because they were not, the asserted claims of the '902 and '841 patents are not entitled to priority. Without priority, they are invalid because they were clearly anticipated by the prior art, including some of Nextec's patents.

## ARGUMENT

I.  **THE DISTRICT COURT REASONABLY FOUND THAT NEXTEC DID NOT PROVE SHEAR THINNING, AND THUS DID NOT PROVE INFRINGEMENT OF THE '902 AND '841 PATENTS.**

Nextec's appeal from the bench trial rests on a false premise—that the district court engaged in a "confused and legally unframed analysis" that replaced a traditional infringement analysis with a "practicing the prior art" defense.  Blue Br. 29-30.  Apart from that mischaracterization, Nextec challenges only fact findings and credibility determinations the court made at the conclusion of a 19-day bench trial.  The record fully supports those findings, which are entitled to considerable deference in any event.

### A.  The District Court Applied The Correct Legal Standard.

Nextec contends that the district court's legal "reasoning is … clear error" because "[t]he asserted claims and a comparison with the accused methods were never applied as the court's analytical framework."  Blue Br. 10, 24-25.  That is incorrect.  No one disputes that infringement depends on whether an accused apparatus or method possesses or practices each and every claim limitation.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).  Nor does anyone dispute that the "shear thinning" limitation appears in each and every claim asserted at trial.  Thus, the district court's finding that "Brookwood did not use shear thinning," A4175; *see also* A4178, establishes that Brookwood did not practice all of the claim limitations, and thus did not infringe.

28

Nextec's contrary portrayal of the district court's opinion is especially misplaced because the court took pains to connect all the dots in this manner: "I think it's clear, but let me be completely clear. In my view, I've said Brookwood simply did not use shear thinning. And if Brookwood did not use shear thinning, they did not infringe." A4178. The court did not need "to go into *all* the elements of the patents" because that element is dispositive: "without the shear thinning, there is simply no infringement," as the court explained. *Id.* (emphasis added). Far from being "a completely inappropriate analytical framework," Blue Br. 25, that is the familiar element-by-element framework advocated by Nextec.

Having undertaken the correct analysis, the district court did not somehow supplant it with a "practicing the prior art" defense. Instead, the court focused at all times on whether there was sufficient proof of shear thinning. *See, e.g.*, A4176-77; A3445-46; A3358; A3295. Put differently, the court did not dismiss Nextec's purported evidence of shear thinning as being legally irrelevant, or as being overridden by an affirmative defense; instead, the court found that Nextec's evidence through the eighth day of trial amounted only to "theories" showing at most the "possibility" of shear thinning. A3445; A4176-77. The court found that speculative theory insufficient to carry Nextec's burden of proof, especially considering that Brookwood's experts had effectively "counter[ed]" Nextec's supposition. A4177.

Although the district court could have ruled against Nextec for that reason alone, *see Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1345-49 (Fed. Cir. 2008), it offered Nextec a second way to try to carry its burden of proving infringement.  As explained above, the court credited testimony of Nextec's own expert that:  (i) Brookwood's historic, solvents-based practice did not employ shear thinning; and (ii) if a company were to change from such a non-infringing approach to an infringing use of shear thinning, that change would be purposeful, not accidental, and would be accompanied by several specific steps needed to effectuate the transformation.  *See* pp. 19-21, *supra*; A3445-46; A4176-77.  The court then considered evidence of whether Brookwood had taken those steps.  *See* pp. 21-23, *supra*; A4176-77.

Thus, when the district court considered whether Brookwood had changed its practices, the court was not recognizing a "prior art defense" to infringement.  It was considering evidence of whether there was any shear thinning, and thus any infringement, in the first place.  Parties may prove or disprove infringement by direct or circumstantial evidence.  *Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303, 1310 (Fed. Cir. 2013).  Moreover, different means of proof may suffice in different cases, because "an infringement analysis is fact-specific."  *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1371 (Fed. Cir. 2010); *see also Lucent Techs.*, 580 F.3d at 1318.  That is why a district court's decision to admit

evidence at trial, and a fact finder's consideration of that evidence, are entitled to great deference. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985); *SEC v. DiBella*, 587 F.3d 553, 571 (2d Cir. 2009).

In this case, the district court's decision to consider this secondary, circumstantial means of proof at a bench trial was especially sensible. As explained above, Nextec had failed to carry its burden with direct evidence of shear thinning; Brookwood had followed a concededly non-infringing, solvents-based approach that had been standard in the industry for decades; Nextec's expert had testified that a conversion to shear thinning would be accompanied by significant and specific types of verifiable activity; and extensive evidence showed there had been no such activity. *See* pp. 17-23, *supra.* Especially on this record, the court acted well within its discretion in exploring this avenue of proof.

Perhaps because the district court's reasoning is so unassailable, Nextec attacks Brookwood's trial strategy, claiming that Brookwood asserted a "practicing the prior art" defense. *See* Blue Br. 5-6. That contention is incorrect and irrelevant because the district court's decision is all that matters. When Nextec asserted at trial that Brookwood was treading into issues of validity during the infringement phase, the court either moved Brookwood on to other questioning, *e.g.*, A3434, or appreciated that the questioning had another purpose. For example, at the time of trial, the court had not made formal rulings on some claim constructions.

Accordingly, during the infringement case, Brookwood's counsel raised the content of the prior art so as to pin down the scope of the claimed invention. *E.g.*, A3262-64; A3438. That was appropriate, though it has no bearing on the court's reasons for finding that Brookwood did not practice the "shear thinning" limitation.

Nextec's final legal argument is that Brookwood should have borne the burden of proof on the question whether it had changed from its historic, non-infringing practice to shear thinning, and that Brookwood could not carry that burden of proof with oral testimony. *See, e.g.*, Blue Br. 28, 30, 32-33. But a patentee always bears the "burden to prove infringement," a burden that never "shifts to the other party." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008). Nextec cites only cases concerning the requisite proof for a prior-use invalidity defense. *See* Blue Br. 25 (citing, *e.g.*, *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1189 (Fed. Cir. 2002)). Those invalidity cases are irrelevant to proof of infringement. As explained above, the district court did not recognize or apply a "practicing the prior art" defense; it found no infringement.

If anything, the district court leaned over backwards to accommodate Nextec by offering it a second means of proof and requiring Brookwood to present witnesses (whose testimony *was* corroborated by significant documentary

evidence, *see* pp. 21-22 *supra*; 43-49, *infra*) on this question. *See* A3444-46. In any event, even though Brookwood did not bear the burden of proof, the court found that Brookwood had shown that it did not practice the claimed shear thinning. *See* A4177.

### B.    The District Court Reasonably Found That Nextec's Case Rested On Unproven Speculation That Brookwood Had Refuted.

Because Nextec's remaining arguments are intensely fact-bound, they run headlong into the record and the standard of review.

#### 1.    Brookwood relies on solvents and pressure, not shear thinning.

##### a.    *Nextec demonstrated at most a theoretical possibility of shear thinning.*

Nextec argues that several scanning electron micrographs of Brookwood's fabrics show that the fabrics have certain characteristics that, according to Newton's Second Law, must have been caused by shear thinning. *See* Blue Br. 19-20. Nextec accuses the district court of having "ignored altogether" this "conclusive" proof, and accuses Brookwood of having failed even to respond to it: "Brookwood's entire response to this evidence is that it continued to use partial manufacturing processes and partial polymer composition recipes that Brookwood had used in the past." Blue Br. 19, 21-22.

None of that is true. The district court specifically addressed the SEMs and Dr. Cole's related testimony: "She displayed certain photographs referred to as

SEMs which were taken generally of cross sections of fabric coming out of the process at Brookwood.  And she voiced the opinion that what was shown in those SEMs could only come from shear thinning." A4176; *see also, e.g.*, A3444-45 (court's discussion of expert testimony); A3144 (court's questioning of Dr. Cole); A4162-63 (court's questioning of counsel about SEMs).  In the court's view, this testimony "was of great interest," but "showed [only] the *possibility* of shear thinning." A4176 (emphasis added).  "[A]lthough it was well considered and backed up as well as she could do, it was theory." A4176; *see also* A3444-45. Dr. Cole herself admitted that looking at SEMs could not definitively tell the viewer how a polymer composition got onto or into a web. *See* A3098.

Nextec's appeal brief proves the district court was right about the theoretical nature of its case.  Throughout its brief, Nextec relies heavily on "Newton's Second Law." *See* Blue Br. 2, 13, 19-21, 28, 36-, 37.  Nextec cites nothing in support of that reliance.  No one presented a Newtonian treatise or asked for its admission into evidence.  No expert testified about Newton's law.  Needless to say, Nextec's reliance on supposed "undisputed testimony—from both Brookwood's and Nextec's experts—*and from Sir Isaac Newton*" is misplaced.  Blue Br. 19 (emphasis added).  Sir Isaac Newton did not testify.  In any event, Nextec's reliance on Newton's Second Law is, almost by definition, reliance on theory instead of actual facts concerning KK1.

34

### b.    *Brookwood refuted Nextec's speculation.*

If there could ever be a case in which a fact finder is obligated to accept theoretical speculation, this is not it.    As the district court found, two of Brookwood's experts "counter[ed] the expert theory put forward by" Nextec. A4177; *see also* A4178.

Dr. Peter Hauser demonstrated that the pressure of the KK1 blade alone causes polymers with viscosities similar to those of M-1074B and 52668 to pass into fabric.    *See* A3208-14; A3371-74; A3409.    To do so, he coated fabric with industry-standard, non-shear-thinnable polymers using the KK1 machine; SEMs showed passage of the material into the fabric.    *Id.*    In a separate experiment, Dr. Hauser also used pressure alone to force Brookwood's Level 5 and 7 polymer compositions into fabrics.    A3371-74; A5749-51.    He testified that his tests "show[ed] that it's possible to place polymer—to get a coating on a web with just pressure alone."    A3410.    In other words, Dr. Hauser showed that, with polymers having the relevant viscosities, shear thinning is *not* the only possible way to produce results that are "very, very similar" (in the district court's words) to those allegedly depicted in Nextec's SEMs.    A4178.

Dr. Pine corroborated Dr. Hauser's findings.    *See, e.g.*, 3200-01; A3205-06; A3208-14.    In view of Dr. Hauser's experiments, Dr. Pine concluded that "anything having a viscosity of 20,000 centipoise or less goes into the fabric using

the KK-1 coater" because of the pressure exerted by the knife, not shear thinning. A3200-01; A3206. The viscosities of M-1074B and 52668 are around 18,000-22,000 and 4,000-5,000 centipoise, respectively. *See* A3159; A3205. Dr. Pine concluded that "under the Brookwood knife what clearly makes the liquid go in is the pressure exerted by the knife"—*not* shear thinning of the polymer composition. A3200.

Nextec attacks a straw man by emphasizing that the SEMs of Dr. Hauser's test fabrics and Brookwood's fabrics are not identical. *See* Blue Br. 41-43. Dr. Hauser did not testify that they were. To the contrary, he testified that his experiment on non-shear-thinnable materials was *not* designed "to duplicate" Brookwood's manufacture of the Level 5 and 7 fabrics. A3411. Instead, by using non-shear-thinnable materials, he sought to determine whether he could achieve "a coating [on KK1] using … pressure only," contrary to Nextec's theory that shear thinning was the only theoretically possible means of achieving the coating found on Brookwood's products. A3411. Most of Nextec's critiques are irrelevant to that stated objective. Moreover, the evidence at trial demonstrated that the two sets of SEMs share "very, very similar characteristics," as the district court found, A4178; *see* A3213; A3409-10—not that they were "vastly different," as Nextec claims, Blue Br. 42.

Nextec contends that, without shear thinning, the SEMs of Brookwood's Level 5 and 7 fabrics and Dr. Hauser's experimental fabrics *should* be identical. *See* Blue Br. 42-43. This is just another example of Nextec arguing that, because the facts do not fit its theory, the facts must be wrong. Dr. Hauser, a professor of textile chemistry at North Carolina State University who has extensive experience with SEMs, A3361-62, A3368, explained that the two sets of SEMs were different for two reasons. First, because his non-shear-thinnable samples had higher solid content (100% versus 30% in the 52668, for example), "there was more mass under the knife blade as it was passed," causing the non-shear-thinnable sample to penetrate further. A3411. Second, the different chemical compositions of the coatings also contributed to different flow. *Id.*; *see also* A3202. But these differences had no bearing on the point of the studies—to show that penetration could take place on KK1 through pressure alone, without any shear thinning. *See* A3371; A3411.

Dr. Pine confirmed the results of Dr. Hauser's study and then proved the point a second time in another study credited by the district court. He showed that "when the fluid goes through underneath the Brookwood blade it doesn't spend enough time there for shear thinning to occur." A3198-99; *see also* A3190-91; A3445; A4177-78. As Dr. Pine explained, shear-thinnable materials have a critical point, known as the "critical shear rate," at which shear forces start to lower the

materials' viscosities (*i.e.*, to "shear thin" them).  A3193.  Dr. Pine offered the court a demonstration with Silly Putty—"a very, very viscous liquid."  A3191-93. When Silly Putty sat on the bench, it slowly deformed ("flowed") as the bottom of the ball flattened over the course of 30 seconds to a minute.  A3191.  When a force was applied quickly (by dropping it), the Silly Putty bounced, responding elastically and not flowing.  A3191-94.

Dr. Pine thereby demonstrated that shear forces must be applied over the course of a certain amount of time (to reach the critical shear rate) before they can lower viscosity.  *Id.*  In addition, Dr. Pine explained that the longer a shear force is applied, the more viscosity decreases.  Thus, even once sufficient time passes for the critical shear rate to be reached, the shear force must continue for an additional amount of time for appreciable shear thinning to occur and lower the viscosity.  *Id.*

Dr. Pine determined that a coating is under the KK1 blade for two one-thousandths of a second and that, in order for 52668 and M-1074B to shear thin, they would have to be under the blade for at least a tenth of a second.  A3199; A3203.  Brookwood's blade width of 13 or 17 thousandths of an inch is simply too thin to give the coating enough time to shear thin.  A3196; A3199; A3203.  As the district court found, "the difference between one tiny amount of time and a slightly larger amount of time can make all the difference …."  A4177.

Nextec offers no substantive response, instead discounting Dr. Pine's testimony as "supposition." *See* Blue Br. 39. Not so. Dr. Pine explained how he determined, through the use of rheology charts, *e.g.*, A6024, the relative amount of time it would take for shear thinning to change the viscosities of M-1074B and 52668. A3235-37. As the Director of the Center for Soft Matter Research in New York University's physics department, Dr. Pine is recognized for his work on shear thinning and shear thickening by the Society of Rheology. *See* A3190-91. (Rheology is the study of the flow of matter.)

Nextec also argues that Dr. Pine's testimony contradicted Mr. Colasanto's. *See* Blue Br. 39-41. In reality, both witnesses explained that, if some small amount of shear thinning were to occurr under the KK1 blade, that amount would not be sufficient to cause the polymer composition to flow into the web, as required by the patent claims. Dr. Pine clarified that there may be "a little bit" of shear thinning but not enough "to make any difference for how the liquid goes into the fabric." A3203. Mr. Colasanto similarly stated that "there may be a small amount of shear thinning" but not enough to "caus[e] the coating to flow in the KK1 coater; it's the presence of solvents and the pressuring under the knife …." A3310; *see also* A3307. Nextec's expert agreed that there are degrees of shear thinning, and that shear thinning to cause the polymer to flow into the web is a deliberate and significant amount of shearing. *See* A3432.

That distinction is important because the asserted patents require shear thinning not in the abstract, but shear thinning sufficient "to cause [material] to flow into the web" or be "place[d] … into the [web]." A149, A206. The district court understood the witnesses' testimony on this point, stating that Mr. Colasanto had testified that, although there may be "incidental" shear thinning, it did not cause polymer to flow into the web. A3310; *see also* A3422. As the court observed, "there might be some incidental shear thinning, but it is not that which thins in order to get the coating done." A3422; *accord* A3445.

Finally, Dr. Hauser also testified that Brookwood's M-1074B and 52668 formulations have solvent contents as high or higher than those disclaimed by Nextec during prosecution of these and related patents. *See* A3375-76; p. 13, *supra*.

### c. *Lawyer argument and untrained observations are no substitute for the actual trial record.*

In the end, Nextec only underscores the importance of the standard of review by asking this Court to draw its own conclusion from a small selection of the SEMs considered at trial, and from three others—A5167, A5168, and A5164—that were not admitted at trial. *See* Blue Br. 20-21, 26, 34-35, 37, 42-43. As the expert testimony at trial showed, it is difficult at best to draw conclusions from isolated SEM photographs. A3410. A SEM is only a snapshot of the coating level at a very small point on the fabric. *See* A3208; A3368; A3410. Tens of thousands of

individual SEMs could be taken of a single yard of fabric, none of which could identify conditions over the entire fabric. *See* A3368-69; A3410. As Dr. Hauser explained, for example, fabric cut in different places will generate different images. A3410. Nextec's own SEMs show a wide variety of penetrations in a single image, showing how variable and inconsistent they can be. *See* A3143-44; A3368.

Thus, "[y]ou could look at various SEMs [from a given fabric] to choose what you wanted to see." A3368. The experts testified that, while SEMs may show the penetration of polymer into a fabric, they do not reveal what caused it to enter the fabric. *See* A3200; A3369; *see also* A3098.

Nextec's assertion that the SEMs demonstrate results that must have been caused by the claimed shear thinning is not only theoretical speculation based on an unreliable premise (Nextec's interpretation of a handful of cherry-picked SEMs), it is actually refuted by the SEMs themselves. As Dr. Hauser testified, SEMs of Brookwood's Level 5 and 7 fabrics showed "surface coating" and "sticking together" inconsistent with the patented invention, which requires that the polymer enter the fabric, encapsulate individual fibers, and leave the surfaces substantially free of polymer. A3362-67. He reviewed at least 14 such SEMs with the court, and testified that they were consistent with historic surface coating because the polymer was on top of the fabric and the surface was not substantially

free of polymer. *Id.* (describing, *e.g.*, A5000; A5009; A5068-75). Indeed, Dr. Hauser specifically testified that, of the five SEMs of accused fabrics that Nextec identifies in its brief, four demonstrated characteristics inconsistent with the patents' claims. *See* A3363 (analyzing A5070 (PX729-39) and A5071 (PX729-40); A3367 (analyzing A5000 (JX21-1) and A5009 (JX21-10)).

In addition to asking this Court to make its own scientific determinations contrary to the district court's findings and the expert testimony, Nextec asserts facts that are not in evidence. For example, Nextec's contention that some fabrics "show approximately 4-times greater penetration" than others, Blue Br. 43, is pure attorney argument. So is Nextec's assertion that "[s]olvents cannot explain how two polymer compositions with a starting concentration differential of 4x yielded nearly identical viscosity *in situ*." *Id.* at 39. There was no direct evidence—from anyone—about the "viscosity in situ." *See* A3445. As the district court explained, no expert can "testify … in any sense of actual measurements, as to exactly what happened under that blade." *Id.*

As noted above, Nextec also cites "evidence" that was not admitted at trial. *See* Blue Br. 43 (citing A5167, A5168, and A5164); Blue Br. 15 & n.2 (acknowledging in a footnote that the district court excluded another exhibit that Nextec cites in its opening brief). Having heard the witnesses and considered the

evidence, the district court, as finder of fact, was entitled to credit Brookwood's evidence over Nextec's theory. *Anderson*, 470 U.S. at 573-75.

## 2. Brookwood did not change its long-established, and admittedly non-infringing, practice.

For those reasons alone, the district court could have reasonably found that Nextec failed to prove its case. The court's additional finding, that Brookwood did not depart from an admittedly non-infringing practice, removes any doubt about whether Brookwood practiced the claimed shear thinning. *See* A4176-77.

As discussed above, Dr. Cole agreed that Brookwood's historic, solvent-based process was non-infringing. *See* A3431-32; *see also* A3700. She also testified that, to infringe, Brookwood would have had to make deliberate changes to its process, A3431-33, marked by extensive research and development followed by at least three steps: changing the coating material; changing the geometry of the machine; and either increasing the speed or reducing the coating, *see* pp. 19-21, *supra*. The district court correctly found "no evidence whatever that Brookwood took any steps whatever to" alter its coating process in those respects. A4177. Though Nextec derides that finding as "amazing[]," Blue Br. 10, Brookwood presented overwhelming evidence that it had not taken the steps that Dr. Cole testified would be necessary for Brookwood to infringe. *See* A3431-33; A4177. No fewer than seven Brookwood employees, all of whom the court expressly found to be credible, testified to that effect. *See* A4177. During discovery,

43

Brookwood had also produced extensive documentation of its research and development efforts, none of which indicated that it had taken those or any other steps to begin shear thinning.

Ms. Bagley, the President of Brookwood's finishing plant, testified that the same sharp knife used on KK1 from the time of its creation in 1962-64 is still used today. A3151, 3153. Mr. Nelson, who has worked for Kenyon Industries since 1978, testified that Brookwood has used sharp blades like those used for Level 5 and 7 fabrics "since at least 1979." A3525; *accord* A5839-40. As Nextec admits, Brookwood also "introduced schematics of knives used on the KK1 and old photographs of ... the KK1." Blue Br. 33; *see, e.g.*, A3151. Mr. Boiardi, the inventor of Brookwood's decades-old Ken Reign method, corroborated Ms. Bagley's and Mr. Nelson's testimony. A3539; A3572-73.

Mr. Boiardi also described having "depressed the blade as far as [it] could go"—"as much as we could and still run the product"—at least as early as 1993. A3565. Documents confirmed that testimony. A5838. Several other witnesses testified that the KK1 blade has a "small range of adjustment" within which it can be positioned for coating. A3164; *see also, e.g.*, A3253-54; A3491; A3527; A3530-31. Brookwood has used the blade in the same position for all fabric with the amount of coating used for the Level 5 and 7 fabrics since it developed Ken Reign in the 1980s. A3157; A3163; *see also* A3253-54; A3530.

44

Nextec claims that Brookwood "admits to ... making the conscious decision to move from Brookwood's historic urethane-based polymer compositions to silicon-based polymers, like those taught in the asserted patents." Blue Br. 15. In reality, Mr. Boiardi testified that Brookwood had been using similar polymer compositions—including silicon polymers—since the 1980s, and that the overall set-up for processing Level 5 and 7 fabrics was substantially the same as the Ken Reign setup used since the 1980s. A3538-39, A3566-70. Three other employees agreed. A3156-57; A3523; A3619. Lab notes and fabric samples also showed that Brookwood used similar silicon polymer compositions for many years. *E.g.*, A5090; A5841; A5842; A5843; A5844; A5845; *see* Blue Br. 25, 27 (acknowledging this evidence).

Nextec cites no evidentiary support for its contrary assertions about Brookwood's use of silicon-based polymers. Instead, Nextec relies on its own attorneys' argument and a draft attorney opinion letter that the district court excluded as hearsay. *See* A3619-22. Nextec acknowledges that the court excluded the exhibit, makes no effort to show the court abused its discretion by doing so, but relies on it anyway. *See* Blue Br. 15 & n.2. When Nextec attempted to use the excluded document to impeach a witness, the witness denied having made the statement Nextec attributed to him, A3622, and testified, consistent with all of the

other evidence discussed above, that Brookwood had used silicon-based polymers "for quite[] some time," A3619.

Ms. Bagley also testified that Level 5 fabric is "run on the coater at a speed of 9 to 10½ yards per minute," speeds unchanged since the 1970s. A3152. Two other witnesses and documentary evidence, including Brookwood's "coating card" guide to the parameters for preparing Level 5 fabric, corroborated that testimony. *E.g.*, A3526; A3529; A3537-38; A5090; A5839-40.

Nextec claims that Brookwood's witnesses were "not credible." Blue Br. 34-35. Yet the district judge, who observed and at times questioned the witnesses, *e.g.*, A3306-07; A3431-33; A3209-10; A3315-16; A3321, found otherwise, A4177. His determination controls. *See Anderson*, 470 U.S. at 575; *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). Nextec's contention that the witnesses' testimony was mere "conjecture as to what might have happened in the past," Blue Br. 34-35, is equally untenable. As demonstrated above, the witnesses had first-hand experience with Brookwood's current and past practices, and contemporary documents showing Brookwood's historic practices confirmed their testimony. *E.g.*, A5090; A5841; A5842; A5843; A5844; A5845; *see* Blue Br. 25, 27 (acknowledging this evidence).

Nextec attacks the witnesses' credibility based on two statements by Brookwood employees that the 72-inch-long KK1 knife, A3525, is "slightly lower

46

than the surface of the table" when preparing Level 5 fabric, A5088; A3491; *see also* Blue Br. 34. Those statements, which were made pre-suit and early in discovery, turned out to be incorrect; measurements later showed that the knife "was clearly above the table." A3163-64. Ms. Bagley testified that, while the knife is above the table, it "is so close to where the table is" (0.045 inches above, A3529-30) that it may have *appeared* to others to be below, A3163. Other witnesses corroborated her testimony. *See* A3525; A3533. Nextec's attempt to discredit seven witnesses on this basis, after the court found them to be credible, A4177, only underscores its indifference to the standard of review.

Nextec's contention that "Brookwood admits to having embarked on a year-long campaign to replicate Nextec's method," is also false. *See* Blue Br. 15. Brookwood employees' testimony and supporting documentation, including the testimony cited by Nextec, A3522, show the opposite. *See* pp. 21-23, 43-47, *supra*; *see also* A3532. Nextec responds that the district court "ignored that Brookwood conducted over 150 trials and tweaks with these formulations to perfect these results (*see* [A]3522), which would have been wholly unnecessary if Brookwood had been practicing the prior art." Blue Br. 38. In reality, the court carefully considered these "trials and tweaks." During summation, for example, the court asked Nextec's counsel, "what is the evidence that the 150 trials were directed to achieve shear thinning? What is that evidence?" A4157. Neither

Nextec's counsel nor its witnesses tied the testing to any of the changes that Dr. Cole testified would accompany a change to an infringing process.

Nor could they have. Manufacturing any new product under Brookwood's traditional solvent-based method requires adjustments. *See* p. 10, *supra.* Larry Ellis, a member of the research and development team, A3160, confirmed that the number of trials for Level 5 and 7 fabrics was well within the normal range for new product development, A3615. Moreover, many of the tests related to matters other than the coating. Satisfying all of the government's performance specifications under the contract was "a balancing act," such that if Brookwood met one performance measure, it might have trouble with another. A3522; *cf.* A3315-21. For example, if Brookwood "met the waterproofness test, [it] might have trouble with breathability." A3522. Brookwood also had trouble meeting the government's dynamic absorption requirement for reasons related to color printing, not coating. A3321. The "learning curve in how to deal with the [raw] fabric," which Brookwood had not used before, was another factor. A3522.

Nextec argues that apparent differences in the thickness of the surface coatings on Brookwood's Level 5 and 7 fabrics and some other fabrics historically made by Brookwood are somehow determinative. Blue Br. 34-35. But even assuming all prior fabrics had such a thick coating, Nextec does not explain why that would reflect a shift to shear thinning, as opposed to differences in the

customers' specifications or the fabrics to which the coatings were applied. Several witnesses, including Nextec's expert, testified that knife-over-air coating methods can be and are adjusted to achieve different coating thicknesses or other qualities.    *E.g.*, A3432-33; A3529; A3517; A3432-33; *see also* A3358. Mr. Boiardi confirmed that Brookwood used different coatings to achieve different fabric qualities.    *See* A3569; A3583-84.    Indeed, all of the SEMs of prior Brookwood fabrics to which Nextec points are of a fabric known as K-Kote Plus. *See* Blue Br. 26-27, 34 (citing A5025 (PX646); A5026 (PX648); A5028 (PX650); A5029 (PX652); A5089 (PX906)); *see also* A6037-41; A3130-31; A3426-27; A3583-84.  K-Kote Plus was intentionally given what Brookwood termed a "heavy coat," a coating five to ten times thicker than Brookwood's historic Ken Reign fabric.  A3583-84.  Ken Reign, like Brookwood's Levels 5 and 7 (and unlike K-Kote Plus) was created with a tight coat and substantially less coating material. *Id.*; *see also* A3539.  There is no basis for Nextec's assertion that thicker coatings on older fabrics, *see* Blue Br. 32, 34-35, or "full penetration of polymer into" fabrics, *id.* at 26, demonstrate that Brookwood changed its process from one based on solvents to one based on shear thinning.

## C.    Nextec's Remaining Arguments Are Meritless.

Nextec contends, based on one sentence in the district court's opinion, that the court improperly limited the asserted claims to an embodiment disclosed in one

of the patents' specifications. *See* Blue Br. 44. It did not. In discussing Dr. Pine's testimony that fluid did not remain under the KK1 blade long enough to be shear thinned, the court observed that Dr. Pine's testimony was "corroborated" by the patents' illustrations of knives with "considerably greater" thickness than the "very sharp knife used in the Brookwood operation." A4177-78. Far from construing any claim terms, the court was simply referring to Dr. Pine's testimony, which had compared the referenced knives in describing the impact of the knife on flow rate. *See* A3196; A4178. When Nextec raised a similar objection during Dr. Pine's testimony, the court confirmed that it was not entertaining an improper comparison of Brookwood's machine to patent drawings. *See* A3196.

Thus, Nextec's claim construction argument about knives is irrelevant. The district court based its decision on the absence of shear thinning, not the size of the knife. Indeed, the court never construed *any* claim terms by reference to knife thickness. Even without the relevant sentence in its opinion, therefore, the court's reasons for finding no shear thinning would stand. *See Alza Corp.*, 464 F.3d at 1289.

In any event, Nextec's claim construction argument is also wrong. As means-plus-function claims, A206-08, the asserted claims of the '841 patent are limited to the structure described in the specification and equivalents thereof. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir.

2003); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002); 35 U.S.C. § 112(f).   The only knife-blade structure disclosed in the specification consists of the blades that Nextec claims to be "merely one of several embodiments." Blue Br. 44; *see also* A157.

Nextec's contention that the district court deprived it of due process by denying Nextec's post-trial motion "without even considering the arguments" in the motion, Blue Br. 49; *see id.* at 11, is frivolous.   In denying the motion, the court stated that it "ha[d] examined the motion." A1.   There is no reason to believe the court did not.   By that point in the proceedings, the court had already issued opinions explaining its rulings.   Nextec's right to rehash the same arguments in that court one last time did not confer a right to another written opinion.

Nor is there any reason to credit Nextec's assertions that the district court made other rulings "without reviewing the cited authorities," Blue Br. 32; "ignored" evidence, *id.* at 4, 19, 35, 38; or "evidenced [a] severe disinterest in reviewing the factual and legal underpinnings of its rulings," *id.* at 29.   Indeed, those complaints are hard to reconcile with Nextec's complaint that the "trial ultimately took five weeks," *id.* at 5, which serves only to demonstrate the court's thoroughness.

Finally, Nextec errs in stating that the proper remedy for any clearly erroneous fact findings (of which there are none) would be reversal.   In that

circumstance, the proper remedy would be vacatur and remand for further proceedings. Although the district court focused the trial on the "shear thinning" claim limitation, Brookwood disputed other claim limitations as well, arguing, for example, that it did not encapsulate the fibers, did not control placement of the polymer composition, did not leave the surface of the web substantially free of polymer, did use a percentage of solvents that the patent applicants disclaimed during prosecution, and also used structures different from those encompassed by the asserted '841 patent claims. *See, e.g.*, A3010-16. Those additional grounds for non-infringement would remain open on remand.

## II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '172 PATENT BASED ON THE PLAIN AND ORDINARY MEANING OF "THIXOTROPIC."

The district court correctly construed "thixotropic" according to its undisputed plain and ordinary meaning. Nextec's "radical redefinition"—which would define the term by reference to the results that thixotropy helps to accomplish in the '172 patent, as opposed to what thixotropy actually is—cannot be squared with the term's plain meaning, the specification, or the surrounding claim language. *See* A29. Moreover, the parties' dispute centers on whether thixotropy requires constant shear forces, as the district court found, or also encompasses increasing shear forces, as Nextec contends. Under either construction, Brookwood did not infringe the '172 patent for the same reasons it

did not infringe the '902 and '841 patents—Brookwood did not use shear force to thin polymers.

## A.    The District Court Correctly Construed "Thixotropic."

The asserted claims of the '172 patent recite a material that is both "shear-thinnable" and "thixotropic." A122-26.  For example, claim 110 covers a "method of controllably applying a combination of treating materials to a porous web, said method comprising," among other things, "applying a curable shear thinnable, thixotropic material to said porous web" and "subjecting said thixotropic material … to sufficient energy to cause the thixotropic material … to flow into the porous web." A125.

The district court construed "thixotropic" materials to be those with "liquid flow behavior in which the viscosity of a liquid decreases over time in response to the application of a constant or steady shear force." A31.  That is the term's ordinary meaning. *See* A19; *see also* A4215.  As the court explained, "the parties agree" that the "generally accepted technical definition[]" of a thixotropic material is a "material [that] will experience a reduction in viscosity over time in response to a *constant* or *steady* shear force." A19-20 (emphases in original).

That plain meaning controls because the patent applicant did not "clearly express" an "intent to redefine claim terms away from their ordinary meanings." A16-17; *accord, e.g.*, *Thorner*, 669 F.3d at 1365; *Helmsderfer v. Bobrick*

*Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns. Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001). To the contrary, the intrinsic evidence "is perfectly consistent with" the ordinary meaning of "thixotropic." A23. The district court found, and Nextec does not dispute, that earlier patents and applications in the same family, including the '051 patent and Application No. 07/167,630, unquestionably use "thixotropic" according to its plain and ordinary meaning. *See* A24-27 & n.8; A29; Blue Br. 46. For example, the '630 application explains that it is "typical of thixotropic systems" that "under a constant shear rate … viscosity drifts downward." A412-13; *see also* A26.

As Nextec concedes, "[t]erms are usually presumed to be used consistently across a family of patents …." Blue Br. 46; *accord NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005). That presumption is especially strong here because the '172 patent incorporates by reference the '051 patent and the '630 application. *See* A29, A88. Because of their express incorporation, those documents are "effectively part of the ['172 patent specification] as if [they] were explicitly contained therein." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001).

Contrary to all of this interpretive evidence, Nextec contends that the patent applicant clearly gave the term a "special definition" for purposes of this one

patent.    Blue Br. 46.    As the district court concluded, however, Nextec is overreading a sentence in the '172 specification that simply describes thixotropy at a general level and then identifies "the *results* of the patented process" as a whole. A28 (emphasis added).    That sentence states:

> The word "thixotropy" refers herein to liquid flow behavior in which *the viscosity of a liquid is reduced by shear agitation or stirring so as to allow* the placement of the liquid flow to form:  (a) a thin film of a polymer composition encapsulating the structural elements (i.e., the fibers or filaments) making up the web leaving at least some of the interstitial spaces open; (b) an internal layer of a polymer composition between the upper and lower surfaces of the web; or (c) some combination of the foregoing.

A96 (emphasis added).

Far from clearly and unambiguously refuting the ordinary meaning of "thixotropic," this passage is fully consistent with it, as the district court found. A29.    The passage does not even address the question in dispute—whether the shear force must be constant—and thus does not express an intent one way or the other on that question.    The specification then goes on to state that thixotropy occurs during "a period of suitable applied stress," but once again does not specify whether "suitable" stress for this purpose is constant, increasing, decreasing, or some combination thereof.    A96.

The specification's *silence or ambiguity* on that question does not *clearly contradict* the term's plain and ordinary meaning or the intrinsic evidence supporting that meaning.  *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1344-45

(Fed. Cir. 2009). The question, after all, is "whether the inventor has used any terms in a manner *inconsistent with* their ordinary meaning." A23 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)) (emphasis in original).

Moreover, most of Nextec's proposed definition of "thixotropic" is directed toward a different issue—what Nextec describes as "the structural *results* (*i.e.*, encapsulating, forming an internal layer, or some combination thereof) of applying a thixotropic fluid to a fabric substrate in the claimed methods." Blue Br. 4. As the district court recognized, it would make little sense to read "the *results* of the patented process" into the meaning of this one claim term. A29 (emphasis in original). It would make even less sense to read those results into this term for the purpose of reading that term's actual meaning out of it.

The results of the patented process, and the meaning of one specific term in the claim, are different things. The claim language confirms that point by addressing results in separate claim limitations. Asserted claim 110, for example, recites "caus[ing] the thixotropic material and modifier(s) to flow into the porous web, wherein at least some of the interstitial spaces of said web remain open." A125. Asserted claim 47 recites "a curable, shear thinnable, thixotropic polymeric material" that forms "a thin film substantially encapsulating at least some of the web members" and "a substantially continuous internal layer." A123. The claims'

separate references to those results confirm that results are not part of the definition of "thixotropic." A29; *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304 (Fed. Cir. 2007). Otherwise, the claims' descriptions of results would be superfluous, as the district court observed. A30.

Conversely, the term "thixotropic" itself would be superfluous. The claims require "shear thinnable thixotropic" materials that produce certain results. *See* A125. If "thixotropic" means nothing more than the application of shear force to produce those results, it adds nothing to the claim that other limitations—the "shear thinnable" limitation and the other limitations specifying the required results—do not cover. As the district court explained, however, the applicant added "shear thinnable" during prosecution to claims that had already included the "thixotropic" limitation and expressly distinguished between the two terms, confirming that neither of those terms is redundant. A39 n.15.

Nextec contends that, under its view, the "thixotropic" limitation and the portions of the claims that describe results would have a "peaceful coexistence." Blue Br. 48. Even assuming *arguendo* that is correct, they would still be *redundant*, and thus superfluous. Redundancy lends itself to peaceful coexistence. But proper claim constructions are rarely redundant. *See InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1325 (Fed. Cir. 2012); *Bicon, Inc. v. Strauman Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).

Moreover, given the wording differences between the general passage in the specification on which Nextec relies, and the language in these different claims, it is not clear that all of the descriptions of results have the same meaning. If they do not, Nextec would be impermissibly using a general description in the specification to override (through the meaning of "thixotropic") the specific, differentiated language of each claim describing the requisite results. *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012).

Either way, the basic point remains. Claim terms must be construed "in a way that comports with the instrument as a whole." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996). The district court followed that directive by adopting a plain-language construction that logically follows from all of the interpretive evidence. In contrast, Nextec would read a single sentence, in isolation, to contradict the term's plain meaning, the other intrinsic evidence, and even some of the other claim language. At a minimum, "the record does not clearly reveal … an intent to redefine the meaning of thixotropic" in such an unlikely manner. A23.

## B.    Under Either Party's Proposed Construction, Brookwood Does Not Infringe.

Because the district court's construction of "thixotropic" is correct, this Court should affirm the court's grant of summary judgment of non-infringement. Alternatively, this Court should affirm because changing the claim construction

would not change the result. *See Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1342 (Fed. Cir. 2010). The district court's finding that Brookwood did not use shear force to thin, and instead "had an operation in which the thinning was done by solvents, as was true in the industry in general," is as dispositive for the '172 patent as it was for the others. *See* A4175.

Even under Nextec's definition, "thixotropy" is "liquid flow behavior in which the viscosity of a liquid is reduced by shear agitation or stirring" and certain results ensue. Blue Br. 46 (quoting A96). As that proposed definition reflects, thixotropy and shear thinning are closely related. "Under the[ir] conventional chemistry definitions, both terms refer, at the broadest level, to liquid flow behavior in which the viscosity of a material is lowered by application of energy thereto—in this context, shear energy imparted by a blade or knife across the fabric." A19-20. In other words, thixotropy, like shear thinning, entails the application of shear energy to lower a material's viscosity.

"The distinction between the two," the district court explained, "is that a shear thinnable material will experience a reduction in viscosity in response to the application of an *increasing* rate of shear, whereas a thixotropic material will experience a reduction in viscosity over time in response to a *constant* or *steady* shear force." A20 (emphases in original). Even if thixotropy were not limited to *constant* shear forces, as Nextec contends, thixotropy would still entail the

application of *some* shear force.  Indeed, Nextec acknowledged in the district court that its proposed construction defines "thixotropy" as the "*extent* of shear thinning." A4219 (emphasis added).  The court likewise determined that Nextec's proposal "describes the results obtained in the patented process *by the application of shear energy* …." A31 (emphasis added).

Now that the district court has found that Brookwood does not use shear force to thin, and instead uses solvents for that purpose, *see* pp. 22-23, *supra*, the parties' dispute over whether "thixotropy" is limited to constant shear force, or also encompasses other shear forces, is beside the point.  Brookwood does not infringe either way.  As the district court emphasized, "[t]he patent talks about thinning *by shearing*," "not about thinning *by solvents*." A3445 (emphases added).

Moreover, like the asserted claims in the other patents, Nextec's proposed definition requires not shear force in the abstract, but "shear agitation or stirring so as to allow" specified results to occur.  A96.  The claim language likewise calls for subjecting thixotropic material "to sufficient energy *to cause* the thixotropic material … to flow into the porous web …." A125 (claim 110 (emphasis added)).  As discussed above, in Brookwood's machine and process, it is solvents, not shear, that cause the polymers to flow into the web.  *See* pp. 8-10,17-23, 33-49, *supra.*  For that reason as well, Brookwood does not infringe the '172 patent under any proposed construction of "thixotropic."  As the district court explained, however,

the applicant added "shear thinnable" during prosecution to claims that had already included the "thixotropic" limitation and expressly distinguished between the two terms, confirming that neither of those terms is redundant.  A39 n.15.

## CROSS-APPEAL

## I.   THE ASSERTED CLAIMS OF THE '902 AND '841 PATENTS ARE NOT ENTITLED TO PRIORITY AND ARE INVALID AS A MATTER OF LAW.

The district court erred as a matter of law in holding that, through a lengthy chain of continuation and continuation-in-part applications, the asserted claims of the '902 and '841 patents can claim the priority date of U.S. Patent No. 5,004,643 ("'643 patent").   The court determined that the patent applicant maintained continuity of disclosure throughout the chain of patents, including in the intervening '051 patent, because "the whole chain relates to the same basic invention."  A4178.  The correct legal standard is far more exacting.  Under that standard, the chain broke at the '051 patent because that patent did not disclose all of the limitations of the asserted claims.  As a result, those claims are not entitled to claim priority to the earlier patents.  Without priority, they are anticipated by Nextec's own patents, and thus invalid.

### A.    To Claim Priority, Each And Every Element Of The Asserted Claims Must Have Been Disclosed In The Earlier Applications.

The '902 and '841 patents are part of a lengthy chain of continuing and continuing-in-part applications dating back to 1988 and 1989, respectively.  *See*

A5846; A5847 (priority charts); A127, A151 (list of related applications for each patent). To claim priority all the way back to the first application, the applicant must have maintained "continuity of disclosure ... throughout [the] chain of patents." *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007). Without such continuity of disclosure, the chain is broken, and subsequent continuation patents are not entitled to the earlier priority date. *See id.* at 1378, 1382; *Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998); *In re Schneider*, 481 F.2d 1350, 1356 (C.C.P.A. 1973).

Thus, each patent in the chain must satisfy the disclosure requirements of 35 U.S.C. § 112, including the written description requirement, "with respect to the subject matter presently claimed." *Schneider*, 481 F.2d at 1356. "Entitlement to a filing date extends only to subject matter that is disclosed; not to that which is obvious. Therefore, the parent application must actually or inherently disclose the elements of the later-filed claims." *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 870 (Fed. Cir. 2010) (citation omitted); *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010); *Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1337 (Fed. Cir. 2010).

The district court held that the applicant maintained continuity of disclosure because "[t]he basic invention was there from the beginning with this so-called '643 patent and the application for it. And although there may have been some

changes in language, some development, which is natural, the whole chain relates to the same basic invention." A4178. But that is not the correct legal standard. "[T]here is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention" in a patent. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345 (1961). Instead, patents confer exclusive rights over specific claims, as defined by the claims' steps or elements. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Thus, each patent application must "contain[] a written description that supports *all the limitations*" of an asserted claim, *Tech. Licensing*, 545 F.3d at 1327 (emphasis added), not just the "basic invention," A4178.

Because the district court applied a looser "basic invention" test, it did not analyze whether the intervening '051 patent disclosed each element of each of the asserted claims. Indeed, the court did not discuss the specific disclosures of the '051 patent, or the specific limitations of the asserted claims. The court stated that "the claim elements at issue in the '902 and '841 are all sufficiently, if implicitly, supported by the text and data contained in the specifications of the earlier patents." A4178. But the *only* reason the court gave for that conclusion is that the entire patent chain involved the same "basic invention." *Id.* At a minimum, therefore, this Court should remand for application of the correct legal standard.

**B.     The '051 Patent Did Not Disclose All Of The Limitations Of The Asserted Claims.**

Because the "probative facts [a]re not in dispute," this Court need not remand; instead, the Court has discretion to apply the correct legal standard in the first instance.  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir. 2000) (citing *Jones v. Hardy*, 727 F.2d 1524, 1531 (Fed. Cir. 1984); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984); *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed. Cir. 1995).  Indeed, "[w]hether the intervening patents in a chain of priority maintain the requisite continuity of disclosure is a question of law [this Court] review[s] de novo." *Hollmer*, 681 F.3d at 1355; *accord Go Med.*, 471 F.3d at 1270.  The priority question in this case turns on a straightforward comparison of the disclosures of the '051 specification and the limitations of the asserted claims.

Under the correct legal standard, the '051 patent does not disclose all of those limitations.  Nextec bears the burden of presenting evidence that each prior patent in the chain of continuing and continuing-in-part applications "contains a written description that supports all the limitations" of the asserted claims.  *Tech. Licensing*, 545 F.3d at 1327; *Research Corp. Techs.*, 627 F.3d at 870.  Only then would the burden shift to Brookwood to prove, "by clear and convincing evidence," that the claims are "not entitled to the benefit of the earlier filing date." *Tech. Licensing*, 545 F.3d. at 1328.

64

### 1.    The '902 Patent

Claim 1 of the '902 patent discloses a "method of controlling the effective pore size of a web." A149. One of the steps of this method involves "applying a curable, shear thinnable material to said web." *Id.* The '051 patent disclosed neither the method of "controlling the effective pore size" nor the application of any "shear thinnable material."

*Controlling the Effective Pore Size.* The '902 patent discloses adjusting pores in fabric not simply to repel water and maintain breathability, but to create fabric "resistant to permeation to a disease causing microorganism such as a virus or bacteria." A136. To do so, the patent claims a method of controlling the size of the largest pores in the web—the "effective pore size"—so that they are smaller than the size of the viruses. A4138. As the patent explains, "[t]he term effective pore size refers to the overall porosity of the web and is determined by the size of the particles or molecules that can pass through the web. Thus, the measurement of the effective pore size correlates to the largest pore present in the web." A136.

The '902 patent points to a table of "[e]ffective [p]orosit[ies]" to show the porosity of the fabric required to prevent, for example, the permeation of pathogens such as the influenza, rabies, and ebola viruses. A139 (Table 1). It then explains how to achieve these effective porosities by using different settings on the machine to control the fabric's porosity. *Id.* (Table 2).

The '051 patent did not disclose this method of controlling effective pore sizes. A4138. To the contrary, the '051 patent noted that its method "surprisingly *retain*[*s*] porosity, breathability, [and] flexibility." A5316 Col. 4:24-26 (emphasis added). Of course, "retaining" porosity for breathability is not "controlling" pore sizes. A4138. Far from disclosing the '902 patent's method of controlling pore sizes, the '051 specification "clearly suggests the contrary by asserting advantages of" not doing so. *See Tronzo*, 156 F.3d at 1159.

The district court denied Brookwood's motion for summary judgment on this issue because the '630 application "discloses 'a method of controlled saturation and impregnation of webs, typically fabrics, with *viscous materials, typically polymers*.'" A73-75. The district court found that the '643 patent contained similar language "disclos[ing] the use of a 'typically polymeric' curable silicone impregnant composition." A461. Because none of this language appears in the '051 patent, it only underscores the inadequacy of that patent's disclosure.

"The expert testimony offered at trial does not require a contrary conclusion," *id.*, in part because "[a]n expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all." *Nutrition 21 v. United States*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991) (quotation marks omitted). Dr. Cole, whose testimony the district court generally credited, pointed to the '051 patent's disclosure of a "hydrostatic resistance" test that "measures the largest pore

sizes." A3990. As Dr. Cole acknowledged, however, the '051 patent discloses *retaining* porosity to achieve a breathable yet water-resistant fabric. A4138, A4139; *see also* A5316 Col. 4:24-16; A4138-39. By contrast, the '902 patent discloses a method of *controlling* effective pore size to, for example, protect against different viruses. It thereby "claimed a distinct invention from that disclosed in" the '051 patent. *See Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

*Shear Thinnable Materials.* The '051 patent discloses the use of shear thinnable silicone polymer compositions. A4139; A5315 Col. 1:15-20. In contrast, the '902 patent broadly claims the use of *any* shear thinnable material, not only polymers, and certainly not only silicone polymers. *See* A4140; A149. Because the '902 claims are so much broader than silicone polymers, the '051 patent did not adequately disclose them. *See Anascape*, 601 F.3d at 1338 ("A description can be broadened by removing limitations.").

The '051 patent "talks only about silicone compositions, sometimes in combination with other polymers, but silicone is the basic composition being used to treat the web." A4140. The patent states that "[t]his invention relates to a flexible porous web which contains an internal coating of a silicone polymer composition." A5316 Col. 3:66-68. "What is claimed is … a curable shear thinning thixotropic polymer composition …." A5346 Col. 57:61-66. "Such

statements make clear that the ['051] patent discloses only [silicone polymer] and nothing broader. The disclosure in the ['051] specification, therefore, does not support the later-claimed, generic subject matter in … the ['902] patent." *Tronzo*, 156 F.3d at 1159.

Although Dr. Cole testified that the '051 patent refers to shear thinnable materials generally, not only to silicone polymers, her opinion finds no support in the patent itself. Dr. Cole pointed to a table in the '051 patent that lists various additives, including "colloidal silica." A3993, A4139; *see* A5337 (Table 6, example 11). But that table discloses possible additives to *silicone compounds*; it does not disclose the use of non-silicon polymer compositions for coating or treating the web. A4139 (Colasanto); A5337 Cols. 45-46. Dr. Cole also pointed to the words "enveloping material" in the '051 patent's definition of "envelope." A3992; A5319 Col. 9:15-21. The only enveloping material disclosed in the patent, however, is a shear thinnable composition containing silicone polymer. A4140; A5316 Col. 4:49-50; A5343-46 Cols. 57-64.

Dr. Cole's testimony "cannot override the objective content of these documents." *Anascape*, 601 F.3d at 1339. Her "rationale … is not sufficient to support the generic claims in the ['902] patent" because her "testimony does not explain why a broader supporting disclosure is necessarily part of the ['051] patent." *Tronzo*, 156 F.3d at 1159-60.

### 2.    The '841 Patent

The '841 patent discloses a "method and apparatus for controlled placement of a polymer composition into a web." A151. Asserted claims 1 and 57 recite a "[s]ystem for controlling the placement of a shear-thinnable polymer composition into a porous web." A206, A207. Because those claims contain "means-plus-function" elements, they do not cover every conceivable structure that could perform the recited functions; instead, each means-plus-function element is limited to the specific structures described in the specification for performing that function and their equivalents. 35 U.S.C. § 112(f).

The patent recites a "means for applying" a shear thinnable polymer composition, and discloses means that involve "a pump" or "a hose." A177, A195. Nextec has admitted that "a pump" and "a hose" are corresponding structures for this element. In fact, it attempted to prove infringement at trial by relying on Brookwood's use of "a pump connected via a hose to a drum of polymeric composition labeled as M-1074-B." A464; A4153.

The '051 patent, however, did not disclose either a pump or a hose as a means for applying a shear thinnable composition to a web. "As such, the ['841] patent discloses a … system different from that disclosed in the ['051] patent," and "the chain of continuity was broken." *Zenon Envt'l*, 506 F.3d at 1381.

Dr. Cole asserted that a "pump" and a "hose" are disclosed in figure 6 of the '051 patent and its associated text. A3997; *see* A5307; A5316 Col. 3:11-31. She testified that this figure "explicitly" involves a pump, and that although the word "hose" does not appear in the specification, "it is shown as a pipe or a means of conveying the polymer composition from the pump to the reservoir where the polymer composition is applied to the fabric." A3997.

This purported pump and hose are, however, shown in the patent for a different purpose. A means-plus-function element is limited to the structure that the specification ties to that function. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360-61 (Fed. Cir. 2000). This limitation "cannot be met by an element in a reference that performs a different function, even though it may be part of a device embodying the same general overall concept." *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 1445 n.5 (Fed. Cir. 1984) (citation omitted).

Dr. Cole did not—and could not—link her explicit pump and implicit hose to the function of applying a shear thinnable polymer to a web. The relevant disclosure relates to "a recycling system" for recycling polymer, not a means for applying the polymer to a web. A4141; A5330-31 Col. 32:66-33:13. That is dispositive because Dr. Cole's testimony is no substitute for an actual disclosure, in the '051 patent, of the use of a pump and hose as a means for applying polymer

to a web.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 719 (Fed. Cir. 2008).

### C.    The Asserted Claims Are Invalid.

For the reasons explained above, the asserted claims of the '902 and '841 patents are not entitled to priority beyond the '051 patent.  They are also invalid.  As Brookwood showed at trial, and Nextec did not contest, the '643 patent disclosed each and every limitation of the asserted claims.  *Cf.* A3897, A4137, A4142-44.  As such, the '643 patent anticipated the claims under 35 U.S.C. § 102.  *See Zenon Envtl.*, 506 F.3d at 1378, 1382; *Tronzo*, 156 F.3d 1154.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment of non-infringement and reverse its judgment that the asserted claims of the '902 and '841 patents are not invalid.

Respectfully submitted on this 3rd day of May, 2013.

 */s/ Daryl L. Joseffer*

Daryl L. Joseffer
Karen F. Grohman
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC  20006
djoseffer@kslaw.com
Tel:  (202) 737-0500
Fax:  (202) 626-3737

Ethan Horwitz
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
Tel:  (212) 556-2100

Adam M. Conrad
KING & SPALDING LLP
100 N Tryon Street, Suite 3900
Charlotte, NC  28202
Tel:  (704) 503-2600

Mary Katherine Bates
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA  30309
Tel:  (404) 572-4752

*Counsel for Defendant-Cross Appellant*
*Brookwood Companies Incorporated*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that

the foregoing brief, exclusive of the exempted portions as provided in Fed. R. App.

P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), contains 16,105 words and therefore

complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(A)(i).


 */s/ Daryl L. Joseffer*
Daryl L. Joseffer

May 3, 2013

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing Opening Brief of

Defendant-Cross Appellant Brookwood Companies Inc. via the Court's ECF

system to each party's counsel of record.

*/s/ Daryl L. Joseffer*
Daryl L. Joseffer

May 3, 2013